**SLIPPERY ROCK UNIVERSITY OF PENNSYLVANIA, PENNSYLVANIA STATE SYSTEM OF HIGHER EDUCATION, Petitioner**

v.

**ASSOCIATION OF PENNSYLVANIA STATE COLLEGE AND UNIVERSITY FACULTY, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2012.

Decided June 7, 2013.

Michael S. Ferguson, Harrisburg, for petitioner.

James L. Cowden, Harrisburg, for respondent.

BEFORE: LEADBETTER, Judge, McCULLOUGH, Judge, and COLINS, Senior Judge.

OPINION BY Judge McCULLOUGH.

*Factual Background*

Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education (University), petitions for review of the April 11, 2012 arbitration award which sustained a grievance filed by the Association of Pennsylvania State College and University Faculties (Union) on behalf of Robert Ammon, Jr. (Grievant). The arbitration award orders Grievant's reinstatement as a full professor and chair of the University's Sports Management Department with no loss of benefits and back pay as well as the purging from the University's files, including Grievant's personnel file, of any reference to Grievant's offensive and inappropriate conduct toward University students who were entrusted to his care and supervision while on a field trip to Spain. As the award is not rationally derived from the subject collective bargaining agreement and contravenes public policy, we vacate the arbitrator's award and reinstate Grievant's termination.

The University is one of 14 schools operated by the Pennsylvania State System of Higher Education (PASSHE). On behalf of the University, PASSHE negotiated a collective bargaining agreement (CBA) with the Union. The CBA governed all aspects of faculty discipline and termination, including the manner in which investigations of complaints about faculty members would be conducted.

Grievant was a tenured professor at the University and director of its Sports Management program. In March 2010, Grievant took 19 undergraduate and graduate students on a spring break trip to Spain. Upon returning from the trip, Grievant met with each student individually to discuss his or her experiences and to solicit feedback on how to improve the trip in future years.

During Grievant's interview with Student T,[1] she informed Grievant that he had been "unprofessional, a hypocrite, and disgusting" one evening at a bar in Madrid when he asked each student how many sexual partners they have had.[2] (Arbitrator's Award at 2.) She said he then told the students that he had had over 100 sex partners, five of them after he was married. Student T told Grievant that the conversation made her uncomfortable and she did not answer, but other students did. Student T also told Grievant that later that same evening, while sitting with a group of students, she asked Grievant who his favorite student was, and he responded by stating that Student X "would be his favorite student if she s----d his d--k." (*Id.*) While Grievant did not make the comment directly to Student X, she was in the group of students sitting with Student T. There

---

1. The arbitrator referred to the specific students at issue in this case as Student T and Student X, rather than by their names. We shall do the same.

2. This conversation was apparently the continuation of a prior conversation held earlier in the evening at another bar with other students and for which Student T was not present.

was also a third incident, in Barcelona, where Grievant used the "f-word" in response to a question by Student T about room assignments. However, he apologized to her a short time later for his outburst.

Grievant was shocked and upset at hearing these allegations and attributed his conduct to being intoxicated. However, he did not dispute any of the allegations. (*Id.* at 8.) Grievant immediately apologized to Student T and asked her what he could do to resolve the matter. She suggested he apologize to all the female students on the trip and speak with her mother because she had informed her mother of what Grievant said on the trip and her mother was upset. (*Id.*)

Grievant held a group meeting where he apologized to all the students for his behavior. Approximately one week later, Grievant met with Student T's mother, who threatened to inform the school's administration of his conduct if he did not do so of his own accord. (*Id.* at 6–8.)

Grievant self-reported his actions to Dean Kathleen Strickland on April 7, 2010. (*Id.* at 3–4.) He recounted what he remembered saying and what he was told he said. Grievant noted that he was intoxicated; however, he did not understand why the students were upset and claimed he was just joking. (*Id.*) Grievant appeared to be upset and nervous as he informed Dean Strickland of this situation, which was not his first incident of misconduct at the University. (*Id.*) Grievant explained to Dean Strickland that in 2006 he was reprimanded for sexually harassing a student and agreed that he would resign if such conduct were to occur in the future. However, Grievant quickly noted that he

did not believe his statements in this instance amounted to sexual harassment.

The arbitrator notes in his decision that in addition to Grievant reporting the matter to Dean Strickland, Student T's mother did as well. (*Id.* at 4, 14). Further, the arbitrator states that Student T reported the matter to the school administration when school officials contacted her after speaking to Student T's mother. (*Id.* at 3).

Dean Strickland contacted Provost William Williams for guidance. Provost Williams directed her to conduct an investigation into the allegations. Dean Strickland investigated by interviewing sixteen of the students that went on the trip and Student T's mother. Based upon the results of this investigation, Dean Strickland prepared a report on May 12, 2010, summarizing what the students and Student T's mother claimed Grievant said. Pursuant to Dean Strickland's report, Provost Williams sent Grievant a letter on May 20, 2010, informing him that a formal investigation was being conducted into his inappropriate behavior during the spring break trip and notifying him that he was to attend an investigatory interview on May 27, 2010. (Reproduced Record (R.R.) at 502.) [3]

Grievant attended the investigatory interview, along with a Union representative, and offered his side of the story. Grievant admitted making improper and unprofessional statements, but he characterized them as "trash talk" and not sexual harassment. Following this interview, Provost Williams sent a letter to University President Robert Smith on June 14, 2010, recommending that formal discipline against Grievant be considered. On June 17, 2010, President Smith sent Grievant a

---

**3.** We note that the University failed to include a "small a" after the Arabic numerals, as is required by Pa. R.A.P. 2173.

letter stating that he was to attend a pre-disciplinary meeting to discuss potential discipline arising from his actions, which Grievant attended. (R.R. at 512.) By letter dated July 9, 2010, the University notified Grievant that he was terminated, effective July 30, 2010, for his "unprofessional conduct during the spring 2010 trip to Spain, namely by becoming intoxicated with University students and making inappropriate sexual comments to and about students." (R.R. at 523.) The letter also noted that this was Grievant's second offense and that he had previously been disciplined for engaging in similar behavior.

The Union filed a grievance and ultimately sought arbitration on Grievant's behalf, alleging that the University violated Articles 15 and 43 of the CBA. An arbitrator held a hearing over three days and framed the sole issue as whether there was just cause to discipline and discharge Grievant. (Arbitrator's Award at 13.) On April 4, 2012, the arbitrator issued an award sustaining the grievance.

In sustaining the grievance, the arbitrator found that "the just cause issue is inextricably interlaced in a pattern of procedural indiscretion and substantive irregularities," the most troubling of which was the University's failure to issue a complaint to Grievant as was required by Article 43 of the CBA. (Arbitrator's Award at 13.) The arbitrator stated that Article 43 requires that "a complaint, verbal or written" be made so as to provide faculty members with notice "of the grounds for investigating what is claimed or alleged." (Id. at 14.) However, the arbitrator concluded that, in this case, there was no complainant and no complaint was ever provided to Grievant. The arbitrator stated that the May 20, 2010 letter sent to Grievant by Provost Williams did not meet the standards of Article 43 because it did not set forth specific allegations or identify a complainant. (Id. at 15.)

Moreover, the arbitrator concluded that: [a] complaint is an integral part of faculty procedural due process in disciplinary matters which not only provides notice of an adverse action but also identifies the adversary.... After conducting an investigation there was nobody to complain ... [n]either did the Employer act as complainant for violation of any rule or policy of the University. Someone must take responsibility for the claim or claims against an accused faculty member. A complaint initiates the process, without it there is nothing to investigate. (Id. at 15.) In reaching this conclusion, the arbitrator rejected the University's argument that Grievant was a self-complainant as "folly" and "unpersuasive." (Id. at 14.)

The arbitrator also noted that Grievant's termination letter states that he was terminated for "unprofessional conduct with students in Spain by being intoxicated with them and having made sexual comments to and about them which were inappropriate." (Id. at 15.) Thus, he concluded that the University never claimed the Grievant's conduct amounted to sexual harassment, nor was he discharged for sexual harassment. The arbitrator noted that it was appropriate for the University to consider Grievant's prior disciplinary history, but concluded that it was improper for the University, in the current instance, to characterize Grievant's actions as a second violation of its sexual harassment policy. (Id. at 15.)

Accordingly, the arbitrator directed the University to do the following: (1) reinstate Grievant to his former tenured position, with no loss of earnings or benefits; (2) set off any earnings Grievant made while separated from what the University owed him for that period of separation;

and (3) remove all references to Grievant's termination and the alleged incidents occurring in Spain from his personnel and other University files. (Arbitrator's Award at 17.) The University now appeals to this Court.

The University argues that the arbitrator's determination did not draw its essence from the CBA because it added requirements to Article 43 of the CBA and failed to recognize that Grievant received a verbal complaint, which he then self-reported to the University. In the alternative, the University argues that the arbitrator's award violates an established public policy prohibiting sexual harassment or discrimination in educational institutions.

*Discussion*

■ Our review of arbitration awards is one of deference. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 149, 743 A.2d 405, 413 (1999). Generally, the award of the arbitrator will be final and binding upon the parties. *Id.* at 149–150, 743 A.2d at 413. However, this Court may review an arbitration award for the limited purposes of determining whether the arbitrator's award draws its essence from the collective bargaining agreement or violates an established public policy. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 595 Pa. 648, 665,

939 A.2d 855, 865 (2007) (articulating the public policy exception to the essence test).[4]

■ Under the essence test, an arbitration award will be upheld if: (1) the issue, as properly defined, is within the collective bargaining agreement; and (2) the arbitrator's award can be rationally derived from the collective bargaining agreement. *Pleasant Valley School District v. Robert D. Schaeffer*, 31 A.3d 1241, 1243 (Pa.Cmwlth.2011) (citing *State System of Higher Education (Cheyney University)*, 560 Pa. at 150, 743 A.2d at 413). We may only vacate an arbitrator's award under the essence test "where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *State System of Higher Education (Cheyney University)*, 560 Pa. at 150, 743 A.2d at 413.

We begin with a review of the relevant provisions of the CBA. Article 5 of the CBA details how grievances are filed. It provides that if a grievance cannot be resolved, the Union may refer it for arbitration. The CBA specifically provides that the arbitrator's award will be final and binding upon the parties. However, Article 5, Section D of the CBA also states that, in reaching an award, the arbitrator may not add to, subtract from, or modify the CBA.[5]

Article 15 of the CBA provides that tenured professors, like Grievant, may only be terminated for "just cause."[6] It

---

**4.** The public policy exception provides that a court will not enforce an arbitration award if the award would contravene a well-defined, dominant, public policy that has either been codified or recognized in legal precedent. *Westmoreland*, 595 Pa. at 666, 939 A.2d at 865–66 (noting general considerations of supposed public interests will not suffice).

**5.** The CBA can be accessed at the following link:
http://www.passhe.edu/inside/hr/syshr/bargaining—agreements/apscuf—agr.pdf.

**6.** Article 15, Section F, of the CBA, states as follows:
   1. A tenured FACULTY MEMBER may be terminated, suspended without pay for a

also states that "[i]n the event that the President believes such just cause exists, he/she shall give written notice, specifying the reasons, to the affected [faculty member] and [Union.]" (*Id.;* R.R. at 486–87.)

Finally, Article 43 of the CBA outlines the manner in which complaints against faculty members are to be investigated by the University. In relevant part, it provides:

The [University] and [Union] recognize that it may be necessary to investigate complaints against FACULTY MEMBERS prior to making a disciplinary decision. When appropriate, attempts should be made to resolve complaints informally. In those cases in which complaints are not resolved informally, the principles below shall apply:

A. If the University determines to conduct an investigation of a complaint, either verbal or written, it shall be initiated and concluded within a reasonable amount of time....

B. The FACULTY MEMBER accused of wrongdoing must receive a copy of the written complaint prior to the commencement of an investigatory interview or pre-disciplinary conference. In the event a written complaint is not submitted, the individual assigned to conduct the investigation shall prepare a written summary and provide a copy of the summary to the FACULTY MEMBER prior to commencing an investigatory interview or pre-disciplinary conference.

(Article 43 of the CBA, R.R. at 489.)

█ In this case, the arbitrator defined the issue before him as "[w]hether there was just cause to discipline and discharge the grievant?" (Arbitrator's Award at 13.) The issue, as framed by the arbitrator, is clearly within the terms of the CBA since Article 15 provides that tenured professors may only be terminated for "just cause." With the first prong of the essence test met, we turn our attention to the second prong, i.e., whether the arbitrator's award is rationally derived from the CBA.

█ The arbitrator based his determination that the University did not have just cause to terminate Grievant on what he perceived was a lack of due process and a failure to comply with the terms of the CBA. Specifically, the arbitrator concluded that the University failed to issue a complaint to Grievant as was required by Article 43 of the CBA, did not identify his accusers, and was not authorized by the CBA to conduct an investigation because a formal written complaint was not filed and there was no complainant. (Arbitrator's

period not to exceed sixty (60) days, or otherwise disciplined only for just cause. In the event the President believes such just cause exists, he/she shall give written notice, specifying the reasons, to the affected FACULTY MEMBER and [Union], and that FACULTY MEMBER shall have the right to grieve solely by means of and in compliance with all provisions of the procedure provided for in Article 5, GRIEVANCE PROCEDURE AND ARBITRATION.

2. A probationary non-tenured FACULTY MEMBER may be terminated, suspended without pay for a period not to exceed sixty (60) days, or otherwise disciplined at any time prior to the expiration of his/her five (5) year probationary period. The President shall give written notice to the affected non-tenured probationary FACULTY MEMBER and [Union], specifying the reasons for the discipline, and that non-tenured probationary FACULTY MEMBER shall have the right to grieve where the non-tenured probationary FACULTY MEMBER asserts that the discipline is discriminatory or arbitrary and capricious, but such assertions shall be processes solely by means of and in compliance with all provisions of the procedure provided for in Section C. of Article 5, GRIEVANCE PROCEDURE AND ARBITRATION. This subsection does not apply to non-renewal actions.

(R.R. at 486–87.)

Award at 13–15.) For the reasons that follow, we conclude that the arbitrator's conclusions cannot rationally be derived from the CBA.

Section B of Article 43 of the CBA is dispositive. In relevant part, it provides that *"prior to the commencement of an investigatory interview or pre-disciplinary conference"* a faculty member must receive a written copy of the complaint against him. (Article 43 of the CBA, R.R. at 489) (emphasis added).

The arbitrator's decision that the University did not have just cause to terminate Grievant had nothing to do with the facts before him, as they are not in dispute and the record contains ample evidence of the nature of Grievant's conduct toward students under his charge on an overseas school trip and support his termination. It is also noted that this is not the first episode of misconduct of a sexual nature by Grievant toward his students as he was formally reprimanded for sexual harassment in 2006. Rather, the arbitrator's decision is based upon procedural grounds that presuppose that: (i) there was no complaint in this matter, written or verbal; and (ii) that a complaint is a mandatory prerequisite for disciplinary action by the University. Neither of these presumptions is rationally derived from the CBA.

First, the arbitrator found that no complaint had been issued because there was no complainant, and in so doing rejected the University's contention that the Grievant was the complainant as "folly". This conclusion has no basis in either the language of the CBA or the facts of this matter. While the CBA provides little specification as to what constitutes a complaint for purposes of Article 43 thereof, it is clear that a complaint need not be in writing, a point which is noted by the arbitrator. (Award at 15). There is nothing in the CBA which specifies that a complaint may be filed only by a third party and for the arbitrator to insert such a provision into the CBA is to open a significant serious loophole to the CBA. It is noteworthy that other than to call the University's position "folly" and "unpersuasive," the arbitrator offers no analysis to support these merely conclusory statements. This Court has held in other contexts that a determination based solely on such unsubstantiated, conclusory statements constitutes an abuse of discretion. *See, e.g., Croman v. Workers' Compensation Appeal Board (Township of Marple),* 706 A.2d 408 (Pa.Cmwlth.1998) (holding that the decision of workers' compensation judge supported only by a conclusory statement constituted an abuse of discretion).

The arbitrator makes no finding that Grievant was in any manner prejudiced procedurally because he self-reported his misconduct to the University. On the contrary, given that Grievant was the first to report his transgressions to the University, he most certainly knew what the bases were of the allegations of "inappropriate behavior of a sexual nature towards female students" when the Provost informed Grievant by letter dated May 20, 2012 that he was being investigated. There is simply no logical basis to conclude that Grievant was denied a reasonable and fair opportunity to defend himself.

Further, the arbitrator ignores his own conclusion that Grievant reported his misconduct only because Student T's mother threatened to do so if he did not. Clearly, Grievant reported himself to the University to avert the "complaint" being made directly by the victim's mother. He should not be able to avoid discipline on the basis that there was not a complaint when he injected himself into the process in an attempt to forestall the victim's mother from complaining directly. Regardless, it

is clear from the record and is noted by the arbitrator that the mother did in fact make a complaint directly to the University when she contacted the Dean. Hence, if a complaint must be filed as a prerequisite to discipline under the CBA, that is satisfied by the mother's complaint to the Dean.

There are two other additional bases that demonstrate that the arbitrator could not rationally conclude that a complaint did not exist. First, Student T herself complained of Grievant's misconduct when she confronted him with it. Grievant was the chair of one of the University's departments. If a student had complained to him of similar misconduct of one of the other faculty members within his department, there would arise a similar obligation to report it to the administration. Again, there is nothing in the CBA or the record to suggest that Grievant is entitled to different treatment because he was the actor as opposed to a third party faculty member. Second, as the arbitrator notes, Student T herself reported the matter to University officials when she was contacted by them. Considering Student T's report to be other than a complaint for purposes of Article 43 cannot be rationally derived from the CBA.

Similarly, the arbitrator's conclusion that a complaint under Article 43 is a precondition before disciplinary action may be commenced under Article 15 of the CBA is not rationally derived from the clear language thereof. Article 15, Section F. 1 (emphasis added) provides that discipline may be commenced in the event the President *"believes such just cause exists."* The arbitrator points to no provision in Article 15 that ties the President's hands from taking disciplinary action unless someone files a complaint under Article 43, nor is there any provision cited by the arbitrator in Article 43 to that effect.

Hence, even if the arbitrator's conclusion that no complaint was filed was rationally based upon the CBA, there is simply no rational or logical basis to conclude that disciplinary action cannot be commenced without a complaint. Again, there is nothing in the record to suggest that Grievant was in any way prejudiced by the process which was undertaken in this matter.

On the contrary, Grievant received the due process that is provided for in the CBA. As set forth in Article 43, section B:

> *"[i]n the event a written complaint is not submitted,"* i.e., in the case of verbal complaints, the person who is to conduct the investigation will "provide a copy of the summary [of the complaint] to the FACULTY MEMBER *prior to commencing an investigatory interview or pre-disciplinary conference."*

(*Id.*) (emphasis added). Article 43 of the CBA expressly anticipates verbal complaints against faculty members and provides that, in instances where there is not a formal written complaint or a complainant, a copy of the written summary of the verbal complaint made against the faculty member will suffice. Therefore, since the initial complaints by Student T (to Grievant) and Grievant (to Dean Strickland) were verbal, there were no formal written complaints that needed to be provided to Grievant. Rather, the University only needed to provide him with a summary of the allegations against him if it chose to pursue disciplinary action. Moreover, since Grievant was a self-complainant, and had received verbal complaints directly from Student T and her mother, the complaint requirements had also already been met in this manner.

Article 43 of the CBA only requires that a copy of the formal written complaint or a copy of the summary of the complaint be provided *"prior to commencing an investigatory interview or pre-disciplinary con-*

*ference." (Id.)*(emphasis added).[7] The University clearly complied with this mandate. On May 20, 2010, Provost Williams sent a letter to Grievant stating that an investigation under Article 43 was being conducted and he was to attend an investigatory interview on May 27, 2010. In this letter, Provost Williams explained the circumstances surrounding the investigation, stating in part as follows:

> It has been alleged, that while on an international trip to Spain over Spring Break this past March, you made several inappropriate remarks to SRU sport management students, including remarks of a sexual nature. Some of these comments offended the students; others indicated it was unprofessional. It should be noted that this matter first came to the [Dean Strickland's] attention based on the self disclosure of concerns with your own behavior while on the trip to Spain. Additionally, there is an allegation that you inappropriately swatted a student on her buttock during the spring semester 2010 while on campus. The student did not find this action welcoming on your part.

> [Dean Strickland] has completed an inquiry based on your self-disclosure concerns with your own behavior on the trip. The Dean has forwarded her findings to my office. Based on the information received, I believe there is sufficient reason to meet with you. Prior to our meeting, please review the attached summary of the completed inquiry along with a copy of the University's sexual harassment policy.

(R.R. at 502.) The University also sent Grievant a letter on June 17, 2010, prior to his pre-disciplinary meeting with President Smith, which summarized the allegations against him:

> This is notification of a pre-disciplinary meeting scheduled for Thursday, June 24, 2010 at 10:30 a.m. in my office to discuss allegations of your inappropriate behavior. It has been alleged, while on a spring study abroad trip in Spain, you engaged in drinking with students to the point of intoxication and making inappropriate comments of a sexual nature to and about students. A copy of the Dean's findings and a copy of the University's sexual harassment policy are enclosed for your review. You have previously reviewed this same information prior to your meeting with the Provost on May 27, 2010.

> At our meeting, please be prepared to provide me your explanation of these allegations. Since this meeting could result in disciplinary action up to and including termination, you are permitted to have [a Union] representative present at this meeting.

(R.R. at 512.) Because Provost Williams' and President Smith's letters provided Grievant a summary of the allegations against him, prior to both the investigatory interview and the pre-disciplinary meeting, the University complied with the plain language of the CBA.

However, in addition to the arbitrator's dismissal of Grievant as a self-complainant as "folly," the arbitrator found both of these notices to be insufficient under Article 43. In doing so, the arbitrator interpreted the CBA to require that Grievant be provided notice prior to the University commencing any investigation whatsoever. Such an interpretation cannot rationally be derived from the plain language of the CBA.

---

7. Moreover, since Grievant directly received complaints from Student T and her mother, he already had full knowledge of the "complaints" when he self-reported them to the Dean on April 7, 2010.

First, the CBA only requires notice prior to an investigatory interview or a predisciplinary conference. Second, the facts of this case establish that Grievant was provided with the necessary due process under Article 43. Here, Student T complained directly to Grievant. Grievant tried to informally remedy the situation by apologizing. However, Student T's mother did not believe this was sufficient and told Grievant to self-report his conduct to the University or she would lodge a formal complaint. Grievant then self-reported his conduct to the University. Thus, he was the individual who provided the initial verbal complaint to the University. Since he made the initial complaint, Grievant was aware of the allegations against him and even admitted making some of the alleged improper statements.

Because Grievant self-reported, Dean Strickland conducted an "investigation" to verify the misconduct he described. Once Grievant's account was verified, the University provided Grievant with formal notice of all of his alleged wrongdoings prior to holding its formal investigatory interview and pre-disciplinary conference. Therefore, the record demonstrates that the University complied with the procedural requirements of Article 43 of the CBA. Accordingly, the arbitrator's award was contrary to, and cannot be rationally derived from, the plain language of the CBA.[8]

Moreover, even if we were to find that the arbitrator's decision drew its essence from the CBA, the award of the arbitrator, finding no just cause and ordering full reinstatement, clearly implicates and violates a well-defined public policy of this Commonwealth and the United States. An award must be vacated if it explicitly conflicts with a well-defined public policy. *Stroehmann Bakeries, Inc. v. Local 776, International Brotherhood of Teamsters*, 969 F.2d 1436, 1441 (3d Cir.1992). Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681(a), prohibits sex discrimination "under any education program or activity receiving Federal financial assistance." Given that the transgressions at issue in the subject grievance are of a sexual nature perpetrated against a student(s) at one of the Commonwealth's universities within the PASSHE by an individual who was not only a full professor

---

**8.** In so holding we respectfully but significantly disagree with the dissent which is predicated on the erroneous conclusion that (1) there was no complaint, and (2) without a complaint, no disciplinary action could be taken by the University against grievant. In support of its first conclusion, the dissent notes that "grievant apologized and reasonably believed the matter was closed." There are several problems with this. First, Grievant's "reasonable belief" that "the matter was closed" is irrelevant. A perpetrator's post incident "reasonable belief" that he has quieted a matter down has no bearing on culpability. Second, Grievant's subsequent action in reporting the incident belies his belief that the matter was closed; otherwise, why report same?

Further, we disagree for the reasons noted above that a complaint is prerequisite to disciplinary action under Article 15. By seeking to mandate a third party complaint as a prerequisite to disciplinary action under Article 15 the dissent is reading language into the CBA that is simply not there.

Lastly, the dissent expressed the concern that our decision "actually creates an incentive for employees not to report." That assertion is a red herring, for if the dissent's logic is to be followed, university professors will be able to avoid the consequences of their offenses if they are able to smooth things over with their victims. Our decision is intended to send a clear message upholding established public policy against sexual misconduct, that the consequences of any form of sexual misconduct will not be avoided by manufacturing loopholes to the disciplinary provisions of collective bargaining agreements with university faculty within the state system of higher education.

but also a department chair, we must reject the arbitration award on compelling public policy grounds. The clearly established public policy and duty to protect students from sexual discrimination in any form has long been recognized.[9]

■ Recently, this Court applied the public policy exception to the essence test, explaining that an arbitration award will not be upheld if it contravenes public policy. *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 413 (Pa. Cmwlth.2011). We noted that public employees, as well as their employers, owe their duty of fidelity to the citizens and must act with concern for the citizens' welfare. *Id.* In ascertaining whether a violation of public policy has occurred, we look to the policy implications of the arbitration award. *Id.* at 413–14. In *City of Bradford*, we held that application of the public policy exception requires a three-step analysis:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances

at hand and the factual findings of the arbitrator.

*Id.* at 414 (internal citations omitted). We identified the conduct leading to discipline as a public employee's theft[10] and noted that theft clearly implicated a well-defined public policy because not only is theft illegal, but theft by a public employee undermines the safety and welfare of Pennsylvania citizens. *Id.* at 414–15. However, the arbitrator considered the employee's good work history and restitution of the stolen money, and reduced his discipline from termination to a lengthy suspension without pay. We held that this arbitration award did not pose a significant risk of undermining the public policy against theft or the city's ability to serve its citizens. *Id.* at 415.

In *Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees*, 956 A.2d 477 (Pa.Cmwlth.2008), *affirmed*, —— Pa. ——, 52 A.3d 1117 (2012), we applied the public policy exception to the essence test and refused to enforce an arbitrator's award reinstating a terminated employee who had committed egregious sexual harassment against a coworker. The employee was employed by Philadelphia Housing Authority (PHA). The employee's female coworker complained of several instances of sexual harassment over the course of 14 months, including touching and inappropriate sexual comments, and PHA's Equal Employment Office ultimately discharged the employee for his pattern of sexual

---

**9.** In rejecting this arbitration award on the additional basis of public policy, we note that the award was rendered in the wake of the events that have engulfed another Commonwealth university within PASSHE for alleged failure to properly heed and respond to prior warnings of egregious sexual misconduct. While the incident in the matter at hand is not of the same nature, it is nonetheless another instance of misconduct of a sexual manner involving someone in a position of trust and

responsibility over students at a Commonwealth university.

**10.** The employee, a city refuse collector, discovered a purse in someone's garbage bag when a large sum of cash spilled out of the purse as he put the garbage bag in the packer, and he took $239 from the purse. *City of Bradford*, 25 A.3d at 409.

harassment in violation of its sexual harassment and discrimination policy. *Id.* at 480.

The employee filed a grievance and a hearing was held before an arbitrator. Despite determining that the employee's misconduct was lewd, lascivious, and extraordinarily perverse, the arbitrator determined that PHA did not establish just cause for terminating him and awarded the employee reinstatement with backpay. *Id.* at 481. On PHA's appeal to this Court, we held that the arbitrator's award violated the clear public policy against workplace sexual harassment. The employee's conduct, repeated instances of sexual harassment, violated the public policy against sexual harassment established by Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e–2000e–17, multiple cases, and the Equal Employment Opportunity Commission's regulations and guidelines. *Id.* at 483. Furthermore, we held that because the arbitrator's award of reinstatement precluded PHA from following its sexual harassment and discrimination policy and protecting its employees from sexual harassment in the workplace, it violated Title VII, and denied PHA the ability to discipline its employee for sexual harassment, placing PHA in violation of Title VII. *Id.* at 487. An arbitration award that violated Title VII of the Civil Rights Act of 1964 was against public policy and could not be enforced.

Title IX provides that "[n]o person in the United States shall ... be subjected to discrimination under any education program or activity receiving federal financial assistance." 20 U.S.C. § 1681(a). Title IX imposes a duty on schools that receive federal money, such as Slippery Rock University of Pennsylvania, not to discriminate on the basis of sex. *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). The public policy against sexual discrimination, particularly of a student by an educator, is well-defined and rooted in the law.

Here, the conduct leading to Grievant's ultimate termination was his inappropriate sexual remarks and comments of a sexual nature to and about female students. The July 9, 2010 termination letter made clear that Grievant was being terminated for his unprofessional conduct during the Spain trip, namely by becoming intoxicated with University students and making inappropriate sexual comments to and about students, as well as the fact that this was the second time that Grievant admitted to engaging in similar behavior, the first of which resulted in a letter of reprimand. The public places its confidence and trust in Commonwealth educators, and an educator violates this trust when he engages in discriminatory behavior with students who are placed in his care. The Commonwealth and United States have a longstanding and well-defined public policy against sexual discrimination, and Grievant's conduct clearly implicates and violates this public policy. The award in this case poses a substantial risk of undermining this public policy and also prevents the University from properly implementing its policy prohibiting such behavior; the arbitrator reinstated Grievant with no consequences for his proscribed misconduct.

Furthermore, Grievant's position as head of the Sport Management department places him in a position of repeated exposure to female students, and he continued his inappropriate behavior after he was disciplined in 2006 for similar conduct, which indicates a substantial risk that female students will be subjected to similar action in the future. The implications of allowing public university employees to violate not only the trust of the students and employers, but also the general public,

contravene long-standing public policy. To deny the University the ability to appropriately discipline Grievant for his conduct would place the University in violation of Title IX. Just as an arbitration award that violated Title VII of the Civil Rights Act of 1964 was against public policy and could not be enforced in *Philadelphia Housing Authority*, here an award that violates Title IX is against public policy and cannot be enforced.

Having concluded that the arbitrator's award was not rationally derived from the CBA entered into by the University and Union, and in any event is a violation of clearly established public policy, we reverse the arbitration award.

### ORDER

AND NOW, this 7th day of June, 2013, the arbitration award entered on April 11, 2012, in the above captioned matter is hereby reversed. The termination of Robert Ammon, Jr., as a faculty member of Slippery Rock University of Pennsylvania is reinstated.

DISSENTING OPINION BY Senior Judge COLINS.

I respectfully dissent from the Majority opinion. I would find that the arbitrator's award is rationally derived from the terms of the CBA and, therefore, would not impose on the parties our own interpretation. The Majority holds that the Grievant self-reported his conduct and, thus, he submitted the "complaint" that is required under Article 43 of the CBA before the University may proceed with disciplining an employee. The arbitrator expressly rejected this interpretation of the CBA and its factual underpinnings.

There is no language in the CBA that defines the term "complaint," thus how the parties employ that term is subject to interpretation through grievance arbitration.

The arbitrator found that after Student T confronted Grievant with his conduct, Grievant apologized and "reasonably believed the matter was closed." "Everyone he reached without exception accepted his apology and no complaint or claim was filed before or after these debriefing meetings. . . . For all intents and purposes, the investigation was commenced yet it produced no complainant." (Award at 14.) The arbitrator rejected the University's argument that Grievant could file a complaint against himself under Article 43. The University even admits in its brief that "there was no direct complaint received." (University Brief at 26.) The arbitrator found that the University failed to identify any specific allegation or specific complaint, even in the University's letters to Grievant of May 20 and June 17, 2010, which the Majority holds is how the University met the procedural requirements of Article 43.

In the May 20 letter, Provost Williams wrote to Grievant that Dean Strickland had completed an investigation "based on your self-disclosure concerns with your own behavior on the trip." Yet, after the investigation, the University failed to identify anyone who believed that Grievant's conduct had risen to the level that merited the lodging of a complaint against him. The Majority notes that Student T and her mother spoke to Grievant about his conduct, but Grievant reasonably believed that the matter was closed. The arbitrator concluded: "Again, Article 43 contemplates that there is a complainant, verbal or written. Failure to proceed without either is a material breach of this provision of this Agreement. It is clear that the Employer had no student complainant on the effect of the grievant's alleged statements or institutional complainant with respect to policies, practices, rules or profes-

sional expectations of faculty....." (Award at 15–16.)

The arbitrator was clearly concerned that the University had failed to identify which policies, practices, rules, or expectations formed the basis of the disciplinary proceedings. This is, again, confirmed by the record, showing the University's confusion regarding the grounds for disciplining Grievant. Provost Williams informed Grievant in the May 20 letter that Dean Strickland had investigated him for allegations of sexual harassment, providing Grievant with a copy of the University's sexual harassment policy. Yet, Dean Strickland, who conducted the investigation, testified that she did not believe Grievant's behavior violated the sexual harassment policy; and President Smith, who made the decision to terminate Grievant's employment, testified that the University did not charge Grievant with sexual harassment and that "his remarks on the trip ... did not rise to the legal line of sexual harassment." (R.R. at 245–246, 291, 294.) Thus, necessarily, when the University decided to terminate Grievant's employment, it was for grounds other than those set forth in the "notice" it provided him.

As a result, the arbitrator ruled that the University did not have just cause under the CBA to terminate Grievant's employment, due to "a pattern of procedural indiscretions and substantive irregularities." We can empathize with the University for wanting to take action in light of the information that Grievant self-reported. Nevertheless, according to the arbitrator, if the University itself was to be the complainant for purposes of Article 43, then the University was required to identify itself as such and the policies that Grievant allegedly violated. The University failed to do that. By overruling the arbitrator's interpretation, the Majority actually cre-

ates an incentive for employees not to report potential problems to University administrators.

I would hold that the Arbitrator's award, due to the absence of clear language in the CBA indicating his interpretation is incorrect, is rationally derived from the CBA.