Clarion County Career Center       :
                                  :

          v.                   :

Clarion County Career Center       :
Education Association,             :    No. 847 C.D. 2021
            Appellant      :    Submitted: August 5, 2022


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                             FILED: December 12, 2022

The Clarion County Career Center Education Association (Association) appeals from the Clarion County Common Pleas Court's (trial court) June 23, 2021 order granting the Clarion County Career Center's (Career Center) Petition to Vacate Grievance Arbitration Award (Petition to Vacate). The sole issue before this Court is whether the trial court properly vacated an arbitration award as violating public policy where the arbitration award modified the Career Center's employment termination of teacher Brent Johnson (Grievant) to a 180-day suspension. After review, this Court reverses.

The Career Center and the Association were parties to a collective bargaining agreement (CBA) for the relevant period July 1, 2016 to June 30, 2020. The CBA included a grievance procedure which has a provision for binding arbitration as the final step. *See* Reproduced Record (R.R.) at 9a. The CBA provides that "[n]o employee in the bargaining unit shall be discharged, disciplined, reduced

in rank or compensation without just cause." R.R. at 14a. However, the CBA does not define *just cause*.

Grievant worked as an automotive technology instructor at the Career Center for approximately 17 years, starting in 1999. The Career Center's supervisors consistently gave him satisfactory annual evaluations. However, Grievant had been previously suspended in 2016 for ten days after the Career Center discovered that Grievant had allowed a former student to attend a student field trip to Pittsburgh without the required volunteer clearances.

In October 2017, following a parent/student complaint that Grievant was displaying inappropriate behavior towards a student,[1] the Career Center conducted an investigation into Grievant's classroom behavior. On October 5, 2017, the Career Center's Superintendent of Record (Superintendent) conducted a meeting with Grievant, the Career Center's Administrative Director (Administrative Director), and the Association's president. The administrators asked Grievant questions regarding the student's allegations, which included Grievant's inappropriate comments directed at a female student, getting too close to the student, and flirting with and touching his classroom aide (Aide), in the classroom. Following the meeting, the Career Center placed Grievant on administrative leave with pay, while it continued to investigate the complaint.

On October 18, 2017, the Career Center's Special Education Coordinator and the Administrative Director met with three students who believed that Grievant was targeting them because of their intellectual abilities. The students related that Grievant told them that they were "stupid" or "dumb" and that Grievant did not provide them the same opportunities as the regular education students. R.R. at 36a.

---

[1] The student was subsequently transferred from Grievant's class because of her discomfort with Grievant's behavior.

On October 19, 2017, the Superintendent sent Grievant a letter scheduling a second meeting on October 24, 2017, and advising Grievant that the meeting's purpose was to continue to investigate the previous allegations, and to discuss new allegations involving inappropriate comments he had directed at students. Following that meeting, on November 13, 2017, the Superintendent sent Grievant a letter setting forth the charges against him and requesting his attendance at a *Loudermill*[2] hearing on November 16, 2017. The letter informed Grievant that the meeting would address the following issues:

> • Having inappropriate contact and communications with students, including comments on appearance, flirting, staring and/or leering, inquiry [sic] into whereabouts outside of school hours, and touching an arm and/or shoulders and touching the hand of a student.
>
> • Said inappropriate contact and communications resulting in student becoming uncomfortable in the classroom and hallway.
>
> • Failing to ensure that students under your charge with [Individualized Education Plans (]IEPs[)] and/or 504 Plans[3] receive appropriate assistance in your classroom.
>
> • Failing to undertake the proper procedure to ensure that when a student was assigned to you that you were fully aware of his/her educational needs, such as a Section 504 Plan or IEP.
>
> • Providing opportunity [sic] to students in a disproportionate and biased manner[.]
>
> • Providing false or misleading information to [Career Center] Representatives[.]

---

[2] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).
[3] Section 504 of the Federal Rehabilitation Act of 1973, *as amended*, 29 U.S.C. § 794 (1985), covers qualified students with disabilities who attend schools, like here, receiving federal financial assistance.

• Telling students they are "too dumb" for automotive curriculum[.]

• Telling students they "should be in culinary" rather than Automotive Shop[.]

• Repeatedly leaving students unattended in the [Automotive] Shop area[.]

• Repeatedly neglecting your duties and students[.]

• Utilizing the [Automotive] Shop for your personal vehicles in violation of previous directive[.]

• Violating a directive pertaining to maintaining appropriate relationships in your professional capacity[.]

• Not adhering to General Motors procedures regarding donated vehicles and subsequent disposal of same.

• Using your time and student time to work on a vehicle that you were restoring[.]

• Providing misleading information to Administrative Director regarding donated vehicles[.]

• Having students wash your vehicle and the vehicle of your classroom assistant.

• Bringing in your go-cart trailer and using students to clean the same.

R.R. at 37a-38a.

The letter further provided:

You were previously given a verbal warning as it relates to your interactions with a classroom aide and maintaining professionalism in the workplace in March of this year (2017) when it was alleged that you were holding hands, feeding each other, touching each other on laps, applying lotion to each other, and whispering in each other's ears.

Please be aware that we plan to discuss all of the above issues. Inasmuch as this meeting could result in a recommendation for disciplinary action against you, up to

4

and including dismissal, you are entitled to have an Association representative with you at the meeting[.]

R.R. at 38a.

At the Loudermill hearing, Grievant denied the allegations. On December 4, 2017, the Career Center Board President issued a Statement of Charges and Notice of Hearing for December 19, 2017 (Statement of Charges). The Statement of Charges enumerated 11 separate charges – some with sub-charges.[4] On December 7, 2017, the Career Center notified Grievant that his suspension with pay was being converted to a suspension without pay. Grievant elected to waive the hearing before the Career Center's Board, and pursued arbitration. On December 19, 2017, the Career Center terminated Grievant's employment for the reasons set forth in the Statement of Charges.

The arbitrator held hearings on September 26 and 27, and December 13 and 14, 2018. On February 18, 2020, the arbitrator issued his Opinion and Award (Award), wherein he sustained charges one, three, six, eight, nine and eleven.

In Charge One, the Career Center alleged that Grievant failed to ensure that his students with IEPs and/or 504 Plans receive appropriate assistance. With respect thereto, the arbitrator concluded:

> Having reviewed the record, I must conclude that the Career Center has supported this [C]harge with evidence that [Grievant] **did some things that were not optimum for seeing that students under his charge with IEPs and/or 504 Plans receive appropriate assistance in his classroom**. It is important to understand the context of the program. It seems as if [Grievant] may have thought that he was doing the best he could with a class of 20 students. He often had to tell students to wait until he finished

---

[4] The Notice of Hearing notified Grievant that: "You are being charged by the [a]dministration with persistent negligence, willful neglect of duties, and persistent and willful violations of or failure to comply with the School Laws of the Commonwealth, including official directives and established policies and[/]or directives of the Career Center." R.R. at 39a.

5

assisting other students. To help every student at the same time is difficult, so he would float from student to student. He did suggest to students to do research online, but that was necessitated by the number of students he had to teach. However, it was not appropriate to tell IEP students with reading comprehension issues to look up answers on Google or the internet. This is not an appropriate approach for an IEP student.

The Career Center had just cause to discipline [Grievant] for the allegations in this charge, but the Association questions whether terminating him meets test [seven] of the just cause analysis: Was the degree of imposed discipline reasonably related to the seriousness of the offense and the [Grievant's] work record? The Career Center's termination of [Grievant] is the highest level of discipline. [Grievant] has had a 17[-]year career with good evaluations. Former students and a colleague testified to his teaching effectiveness. He has had one serious discipline against him. I must conclude that terminating him for this charge is excessive.

R.R. at 56a-57a (emphasis added). Notably, the arbitrator did not find that Grievant discriminated against the students on the basis of a disability.

In Charge Three, the Career Center averred that Grievant violated Career Center policy by not maintaining appropriate teacher-student relationships. Regarding Charge Three, the arbitrator determined the following with respect to the multiple allegations:

- A student credibly testified to the following: That every day, as she was leaving her welding class, Grievant appeared to perfectly time a walk towards her. Some days she wore her welding jacket, which partially covered her posterior. However, on most days she just carried the jacket, and on those days her waist and her posterior could be seen. Grievant made comments toward her about how "those jeans look good on you today" while looking at her posterior. R.R. at 62a. Some days he would say that her welding coat looked a little long, while looking at her posterior. Further, while she would be walking down the hall from her welding class, Grievant would give her *a high five* which was actually a *low five* where the

6

interaction took place against the student's leg. He would grab her hand and pull her closer to him, which she did not like. She felt very uncomfortable but she did it anyway.

- With respect to Grievant's comments regarding another student's jeans, the arbitrator concluded, "that [Grievant] made at least one remark about the way that the jeans looked on [the student,] . . . [and] the remark crossed the boundary of acceptable teacher[-]student interaction." R.R. at 65a.

- Relating to Grievant's alleged comment that a female student needed to "dress to impress" him, the arbitrator concluded that the Career Center did not prove that part of the charge. R.R. at 66a.

- Regarding Grievant's alleged physical closeness to students, the arbitrator concluded that the Career Center did not prove that part of the charge.

- With respect to asking a student where she rode her dirt bike, the arbitrator concluded that Grievant did not intentionally target the student by asking her where she rode her dirt bike "but that the way he asked it could give the student that impression[,]" and concluded that such was negligent conduct on Grievant's part. R.R. at 68a.

Thus, as to Charge Three, the arbitrator concluded:

[A]fter reviewing all of the allegations in Charge Three, the Career Center has proven that [Grievant] violated [Career Center Policy] by not maintaining appropriate teacher-student relationships. He acted inappropriately with [a student] in their several hallway encounters. He acted inappropriately with [another student] in commenting on the way the new uniform pants fit her. He singled her out for questions on where she ro[de] her dirt bike. However, the Career Center's decision's penalty of termination is excessive. It should be reduced to a [30-]day suspension.

R.R. at 69a. Notably, although the arbitrator found that Grievant acted inappropriately, the arbitrator did not find that Grievant sexually harassed any student.

7

In Charge Six, the Career Center claimed that Grievant violated a prior directive pertaining to maintaining an appropriate relationship in the classroom with Aide. With respect thereto, the arbitrator held that the Career Center proved by substantial evidence that Grievant violated the prior directive to maintain an appropriate relationship with Aide.

> The prior Administrative Director . . . had issued [Grievant] a verbal warning about such behavior, but the administration never placed a record of the warning in [Grievant's] personnel file. Since the Career Center has not even placed the prior verbal warning in the personnel file, it is difficult for the Career Center to now deem this conduct to be sufficient to serve as the basis for termination, the highest level of discipline. The termination should be reduced to a [30-]day suspension.

R.R. at 75a-76a.

In Charge Eight, the Career Center alleged that Grievant told students they were either too dumb for automotive curriculum or not smart enough to be in automotive shop. Relating to Charge Eight, the arbitrator found that the Career Center supported the charge with substantial evidence. Grievant, "as an experienced professional educator, should know that such name calling is not appropriate. His actions violated [Career Center] policy. However, the discipline of termination is excessive and should be reduced to a [30-]day suspension." R.R. at 78a.

In Charge Nine, the Career Center averred that Grievant told students they should be in culinary rather than Automotive Shop. With respect to Charge Nine, the arbitrator found:

> [T]he Career Center has proven that [Grievant] made the alleged statements. The students testified credibly that he made the statements to them directly. It appears that he made the statements out of frustration with the students' behavior and conduct. The record also shows that [Grievant] expressed some frustration with the IEP students, telling a fellow teacher that one of the students

8

was "a pain in the Asperger[']s." Giving [Grievant's] testimony some weight, this conduct is still inappropriate. An appropriate time and place to discuss other courses of study with students would be if the student asked for advice or if the discussion took place with a guidance counselor or other student support person[] present. However, [Grievant's] conduct does not rise to the level of misconduct that supports the termination of [Grievant's] employment. Rather, the more appropriate discipline would be a [30-]day suspension.

R.R. at 78a-79a.

In Charge Eleven, the Career Center claimed that Grievant repeatedly left students unattended in the Automotive Shop area. With respect thereto, the arbitrator found that the testimony established that Grievant had left his class unattended; however, the arbitrator opined that a 30-day suspension was the proper discipline.

In his Award, the arbitrator stated:

The Association's grievance is partially sustained. As set forth above, the Career Center presented substantial evidence to prove six (6) of the charges that [Grievant] engaged in misconduct and deserves to be disciplined.

However, the Career Center did not have just cause to terminate his employment. The penalty of termination is excessive, based on [Grievant's] 17 years with the Career Center, his consistent satisfactory annual evaluations and his disciplinary record with only one serious incident of misconduct in 17 years.

The termination of his employment should be converted to a 180[-]day[] unpaid suspension without benefits based on the findings that the Career Center proved six (6) of the charges brought against him. The suspension should be deemed to begin from the date the Career Center suspended him without pay.

The Career Center should immediately reinstate [Grievant] at the rate of pay he was receiving at the date of his termination. It should make him whole for the

9

> wages and benefits lost from the end of his 180[-]day[] suspension to the date of reinstatement. The back pay and benefits should be offset by any unemployment compensation, and wages and benefits from other employment, he received from the date of his suspension without pay to reinstatement.

R.R. at 83a. The Career Center appealed from the arbitrator's Award to the trial court.

Finding the instant matter analogous to the circumstances in *Slippery Rock University of Pennsylvania, Pennsylvania State System of Higher Education v. Association of Pennsylvania State College & University Faculty (Slippery Rock I)*, 71 A.3d 353 (Pa. Cmwlth. 2013), the trial court concluded that Grievant's

> conduct visibly implicates and violates . . . public policies [prohibiting sexual harassment and discrimination against individuals with disabilities]. "The [A]ward in this case poses a substantial risk of undermining this public policy and also prevents the [Career Center] from properly implementing its policy prohibiting such behavior . . . []" by allowing [Grievant] to remain employed which has harmed – and if he is reinstated likely will continue to harm – the Career Center student[s'] welfare by exposing them to discrimination and harassment. [*Slippery Rock I*,] 71 A.3d at 365.

R.R. at 410a. Accordingly, the trial court vacated the Award. The Association appealed to this Court.[5]

---

[5] In reviewing an arbitration award, this Court applies the highly deferential two-prong "essence test." *Chambersburg Area Sch*[.] *Dist*[.] *v. Chambersburg Educ*[.] *Ass*[*'n] (Pro*[.]*), 120 A.3d 407, 412 (Pa. Cmwlth. 2015). First, we decide whether the issue is encompassed by the collective bargaining agreement. Second, if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement, it will be sustained.

*Slippery Rock Univ. of Pa. v. Ass'n of Pa. State Coll. & Univ. Faculty (Slippery Rock II)*, 241 A.3d 1278, 1284 (Pa. Cmwlth. 2020). The parties do not contest that the arbitration award satisfies the essence test. The Career Center argues herein that the public policy exception, discussed *infra*, applies.

The Association contends that the trial court erred when it vacated the Award on public policy grounds. Initially, "the arbitration process allows arbitrators to modify disciplinary penalties and fashion appropriate awards based on the specific facts of a given case." *Cnty. of Allegheny v. Allegheny Cnty. Prison Emps. Indep. Union*, 244 A.3d 873, 882 (Pa. Cmwlth. 2020). "[A]rbitrators are the exclusive fact-finder[s], [and] their judgment is afforded great deference."[6] *York Cnty. Area Vocational-Technical Educ. Ass'n v. York Cnty. Area Vocational-Technical Sch.*, 570 A.2d 105, 107 (Pa. Cmwlth. 1990). The sole issue for this Court's consideration is whether the trial court properly concluded that the Award violated public policy.

> The burden of establishing a violation of public policy rests on the party asserting the public policy exception. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educ*[.] *Support Pers*[.] *Ass*[*'n*]*, PSEA/NEA*, . . . 939 A.2d 855, 864 ([Pa.] 2007).
>
> The Pennsylvania Supreme Court has explained the public policy exception is a "narrow exception to a narrow exception," *i.e.*, the essence test. *Millcreek* [*Twp. Sch. Dist. v. Millcreek Twp. Educ. Support Pers. Ass'n*] . . . , 210 A.3d [993,] 1011 [(Pa. 2019)]. [Our] Supreme Court has established a three-part test for applying the public policy exception:
>
>> First, a reviewing court must identify precisely what **remedy** the arbitrator

[6] The Pennsylvania Supreme Court has held that

> [b]y failing to agree upon and incorporate a definition of just cause into the collective bargaining agreement, and by casting the arbitrator into the role of resolving disputes arising under the collective bargaining agreement, . . . it is clear that the parties intended for the arbitrator to have the authority to interpret the terms of the agreement, including the undefined term "just cause" and to determine whether there was just cause for discharge in this particular case.

*Office of the AG v. Council 13, AFSCME*, 844 A.2d 1217, 1224 (Pa. 2004).

imposed. . . . Next, the court must inquire into whether that **remedy** implicates a public policy that is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests . . . ." Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Id.* (citations omitted). Notably, "the arbitrator's interpretation of the contract controls during this entire analysis . . . and should be upheld absent a clear violation of public policy." *Id.*

*Slippery Rock Univ. of Pa. v. Ass'n of Pa. State Coll. & Univ. Faculty (Slippery Rock II)*, 241 A.3d 1278, 1284-85 (Pa. Cmwlth. 2020) (emphasis added).

[I]n resolving the issue of whether an arbitrator's award violates a well-defined, dominant public policy, there is usually no reason for a reviewing court to reexamine the transcript of the arbitrator's hearing and reevaluate the facts. Rather, only the award itself, and the legal authority supporting the implication of the public policy, are relevant to a public policy exception inquiry. To hold otherwise would result in routine review of the entire factual record every time a public employer raises the public policy exception.

*Rose Tree Media Secretaries & Educ. Support Pers. Ass'n v. Rose Tree Media Sch. Dist.*, 136 A.3d 1069, 1078-79 (Pa. Cmwlth. 2016).

[T]his Court has explained:

[C]ourts are to give arbitration awards deference and are not to second-guess an arbitrator's findings of fact or interpretations. But these awards are not entitled to a level of devotion that makes a mockery of the dominant public policy . . . .

12

> *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Tchrs.*, 171
> A.3d 334, 340 (Pa. Cmwlth. 2017) (internal citations and
> quotation marks omitted). **In evaluating whether an**
> **arbitration award violates a dominant public policy**,
> **reviewing courts consider "both aggravating and**
> **mitigating factors in determining whether an award**
> **poses an unacceptable risk that a clear public policy**
> **will be undermined if the award is implemented**." *Id.*
> (internal quotation marks and brackets omitted); *see also*
> *Pa. State Sys. of Higher Educ., Lock Haven Univ. v. Ass'n*
> *of Pa. State Coll. & Univ. Faculties*, 193 A.3d 486, 500
> (Pa. Cmwlth. 2018) (same). Courts have found arbitration
> awards properly vacated pursuant to the public policy
> exception to the essence test in cases where, **despite**
> **proven explicit and continuous conduct amounting to**
> **sexual harassment in contravention of Pennsylvania's**
> **public policy against such harassment**, <u>arbitration</u>
> <u>remedies imposed very little punishment</u>. *See*
> *Neshaminy Sch. Dist.*, 171 A.3d at 343 (20-day suspension
> with back pay violated public policy against sexual
> harassment); *see also Phila. Hous. Auth.* [*v. Am. Fed'n of*
> *State, Cnty. & Mun. Emps., Dist. Council 33, Local 934*,]
> 52 A.3d [1117,] 1128 [(Pa. 2012)] (award granting
> immediate reinstatement with back pay in the face of
> "egregious" conduct amounting to sexual harassment
> makes a mockery of public policy against sexual
> harassment).

*Cnty. of Allegheny*, 244 A.3d at 881 (bold and underline emphasis added). Similarly,

in *Slippery Rock I*, this Court reversed an arbitration award that reinstated a tenured

university professor who had made inappropriate sexual remarks and comments to

students. In the award, the arbitrator reinstated the professor to his prior position

**with no loss of benefits and back pay** and also required the university to purge any

reference to the professor's improper conduct from its files.

Here, with respect to the first part of the *Millcreek* test, the arbitrator

imposed numerous 30-day unpaid suspensions for Grievant's misconduct, resulting

in a cumulative 180-day unpaid suspension. Regarding the second part of the

*Millcreek* test, despite that the arbitrator did not find that Grievant's conduct

13

constituted sexual harassment or unlawful discrimination, based on the arbitrator's factual findings with respect to charges Three, Eight and Nine, that Grievant engaged in inappropriate conduct with students, it is possible that both the *Award* and Grievant's inappropriate *conduct* implicated dominant public policies against sexual harassment and discrimination.[7]

However, even assuming arguendo that public policies against sexual harassment and discrimination were implicated, this Court must apply the final *Millcreek* test factor – whether the arbitrator's award compels the employer to violate the implicated public policy, given the particular circumstances and the arbitrator's factual findings. This Court acknowledges that a 30-day unpaid suspension for upholding Charge Three or Six, alone, would appear to violate public policy. However, here, each 30-day suspension is a part of an aggregate award imposing a 180-day suspension without pay or benefits. Unlike in the 20-day suspension with back pay in *Neshaminy School District*, and the absence of **any** sanctions in *Slippery Rock I* and *Philadelphia Housing Authority*, here, the aggregate

---

[7] This Court emphasizes that, as described by the Pennsylvania Supreme Court, there is a

> well-defined and dominant public policy against sexual harassment in the workplace, a public policy which is grounded in both federal and state law against sex discrimination in employment, including Title VII, the regulations of the [Equal Employment Opportunity Commission], and this Commonwealth's own [Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963]. *See generally Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64-67 . . . (1986) (hostile environment sexual harassment is illegal sex discrimination and actionable under federal law); 43 P.S. § 952(b) ("It is hereby declared to be the public policy of this Commonwealth to foster the employment of all individuals in accordance with their fullest capacities regardless of their . . . sex, . . . and to safeguard their right to . . . hold employment without such discrimination . . .); Pa. Const. [a]rt. I, § 28 ("Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.").

*Phila. Hous. Auth.*, 52 A.3d at 1123.

14

penalty imposed is a 180-day suspension without pay or benefits, which the Association emphasizes is the equivalent of one full school year. This Court may not infer that public policy demands only the most severe penalty under these circumstances where an arbitrator has imposed substantial discipline.[8] Accordingly, the trial court erred when it vacated the Award as violative of public policy.

For all of the above reasons, the trial court's order is reversed.

_____
ANNE E. COVEY, Judge

Judge Wallace did not participate in the decision in this matter.

---

[8] Although this Court may not agree that the Award adequately penalized Grievant for his conduct, a court must defer to an arbitrator's award if the award does not violate public policy. *See Neshaminy Sch. Dist.*, 171 A.3d at 340.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Clarion County Career Center      :
    :
    v.     :
    :
Clarion County Career Center     :
Education Association,     :    No. 847 C.D. 2021
           Appellant     :

## O R D E R

AND NOW, this 12th day of December, 2022, the Clarion County Common Pleas Court's June 23, 2021 order is reversed.

_____
ANNE E. COVEY, Judge