# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of Higher
Education, Bloomsburg University
of Pennsylvania,
     Petitioner

   v.

Association of Pennsylvania State
College and University Faculties,
     Respondent

:
:
:
:
:
:
:  No. 914 C.D. 2018
:  Argued: April 11, 2019
:
:
:
:

BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE ELLEN CEISLER, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**     **FILED: May 16, 2019**

Petitioner Pennsylvania State System of Higher Education, Bloomsburg University of Pennsylvania (University), petitions for review of an arbitration award dated June 7, 2018, which sustained a grievance filed by the Association of Pennsylvania State College and University Faculties (Union) on behalf of John Barrett (Grievant). The arbitration award orders Grievant's reinstatement to his previous position with no loss of benefits and back pay. The only issue on appeal is whether the arbitration award violates the narrow public policy exception to the essence test by reinstating Grievant despite the University's contentions that Grievant's reinstatement implicates this Commonwealth's public

policy against sexual harassment and poses an unacceptable risk of undermining the policy. We now affirm.

## I.   BACKGROUND

Grievant is an Assistant Professor employed by the University. (Reproduced Record (R.R.) at 359a-63a.) This matter arose when two of Grievant's former students, including a student we will refer to as "Complainant," notified the University of sexual relationships Grievant had with both women. (R.R. at 175a-76a, 794a.) In response, the University conducted investigations into the claims and eventually terminated Grievant's employment on the grounds that his behavior was unprofessional and violated the University's policies against sexual harassment and discrimination.[1] (*Id*. at 672a-73a.) The Union filed a grievance on

---

[1] The University's policy against sexual harassment and discrimination includes sexual violence, which the policy defines as:

> [P]hysical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (for example, due to the victim's use of drugs or alcohol, or because of an intellectual or other disability) . . . . An act is unwelcome when the individual did not solicit or invite conduct, and particularly if the individual indicates that the conduct is undesirable or offensive. Conduct may be unwelcome even where the individual acquiesces or does not complain. *However, if an individual actively participates in sexual banter or discussions without indicating that the conduct is undesirable or offensive, the behavior will not likely meet the definition of 'unwelcome.'*

(R.R. at 676a-77a (emphasis added).) The policy also addresses consensual interpersonal relationships by providing:

> Professionalism in all interpersonal relationships is central to the mission and goals of the University. Therefore, *romantic and/or sexual relationships in which power differentials are inherent are discouraged*. There are inherent risks in any romantic or sexual relationship between individuals in unequal positions of power (*i.e*.: faculty/student, supervisor/employee, supervisor/student employee, student supervisor/student, coach/student athlete). In some circumstances, these relationships may be perceived as consensual by the individual whose position confers power without actual consent by the person with less power. Furthermore,

Grievant's behalf, claiming that the University terminated Grievant's employment without just cause in violation of the collective bargaining agreement between the University and the Union. (*Id*. at 660a-63a.) The parties then participated in grievance arbitration, which resulted in Grievant's reinstatement to his position as Assistant Professor, including back pay and benefits. (*Id.* at 1797a.)

## A. Grievant's Relationship with Complainant

Grievant and Complainant first met when Complainant was a student in one of Grievant's classes in the spring of 2015. (*Id*. at 137a.) At the end of the spring semester, Grievant sent Complainant a friend request on Facebook, which Complainant accepted. (*Id.* at 141a-42a.) During the summer of 2015, Complainant and Grievant corresponded through Facebook Messenger, discussing the possibility of Complainant sharing a written piece with Grievant when she returned to campus in the fall. (*Id*. at 144a.) Complainant and Grievant had no further contact during the summer. (*Id*. at 145a, 789a.) After Complainant returned to school in September, she visited Grievant's office and asked him to set a date to get coffee with her. (*Id*. at 145a, 789a.) Grievant and Complainant began to meet for coffee regularly and exchanged phone numbers. (*Id*. at 379a-80a.) In October 2015, Complainant told Grievant that she wanted to develop a romantic relationship with him. (*Id*. at 147a, 150a-51a, 380a.) Grievant and Complainant began to engage in sexual intercourse before the end of the fall semester in 2015. (*Id.* at 166a, 392a.) Complainant and Grievant spent nights together at Grievant's home, where they would either engage in sexual intercourse or have some type of romantic contact.

---

circumstances may change, and conduct that was previously welcome, may become unwelcome. The existence of a prior consensual relationship will not bar a claim of sexual harassment and may not constitute a defense.

(*Id*. at 682a (emphasis added).)

3

(*Id*. at 169a, 396a.) Complainant testified that on those occasions she would often wake up to Grievant touching her genitals, which made her uncomfortable. (*Id*. at 169a-70a.) Complainant did not discuss her concerns about these acts with Grievant and continued the relationship into the spring of 2016. (*Id*. at 171a-72a.)

Complainant's and Grievant's romantic relationship ended in June 2016, but their friendship continued into October 2016. (*Id*. at 1425a-82a.) In December 2016, Complainant confronted Grievant about rumors she heard concerning Grievant's relationship with another student. (*Id*. at 1483a.) In May 2017, Complainant filed a complaint with the University, alleging that Grievant "has a pattern of targeting his female students . . . and on more than one occasion manipulated [Complainant] physically while [Complainant] was asleep and unable to consent." (*Id*. at 727a.)

## B. University's Investigation and Decision

Upon receiving Complainant's complaint, the Provost and the Director of Social Equity reported the complaint to the University's President, Dr. David Soltz (Dr. Soltz). (*Id*. at 33a.) On May 11, 2017, Dr. Soltz placed Grievant on administrative leave in order to investigate the allegations. (*Id*. at 670a.) The University conducted interviews with Complainant and other persons with information relevant to the allegations and compiled an investigative report containing transcripts of the interviews. (*Id*. at 710a-76a.) After the investigation, the University held a pre-disciplinary conference with Grievant to allow him to respond to the allegations. (*Id*. at 848a, 851a-61a.) Dr. Soltz terminated Grievant's employment by letter dated June 30, 2017, citing Grievant's lack of professional judgment in engaging in sexual relationships with Complainant and another student and, relevant to the matter now before us, Grievant's "engaging in sexual conduct [with Complainant] without [Complainant's] consent." (*Id*. at 673a.) The Union

4

then filed a grievance on Grievant's behalf, claiming that the University terminated Grievant's employment without just cause in violation of the collective bargaining agreement between the University and the Union. (*Id*. at 660a-63a.)

## C. Grievance Arbitration Award

After conducting hearings on the matter, the arbitrator issued an award sustaining the grievance. (*Id*. at 1797a.) Specifically, the arbitrator found that Grievant's conduct did not violate any of the University's policies against sexual harassment and discrimination because neither Complainant nor the other student were students of Grievant at the time the sexual relationships developed. (*Id*. at 1792a, 1795a.) Further, the University's policy did not prohibit either relationship, because the policy does not prohibit romantic, consensual relationships. (*Id*. at 1793a, 1795a.) The arbitrator, therefore, concluded: "The record does not support the [U]niversity's contentions cited in Dr. Soltz's letter as the basis for the termination of . . . [G]rievant's employment with the [U]niversity. As such, the [U]niversity has failed to establish just cause for the termination." (*Id*. at 1795a.)

## II. ISSUES

On appeal,[2] the University argues that the public policy exception applies to invalidate the arbitration award because: (1) Grievant's conduct implicates the well-defined, dominant public policy against sexual harassment; and (2) the arbitration award poses an unacceptable risk that it will undermine the implicated public policy. Specifically, the University focuses solely on the allegedly non-consensual acts performed by Grievant during the course of the relationship.

---

[2] Our standard of review in such matters is referred to as the essence test, which is set forth in the discussion section of this opinion.

5

### III. DISCUSSION

Our Courts employ a deferential standard when reviewing arbitration awards. *Slippery Rock Univ. of Pa., Pa. State Sys. of Higher Educ. v. Ass'n. of Pa. State College and Univ. Faculty*, 71 A.3d 353, 358 (Pa. Cmwlth.) (*Slippery Rock*), *appeal denied*, 83 A.3d 169 (Pa. 2013). This Court applies the essence test to determine "whether the arbitrator's award draws its essence from the collective bargaining agreement or violates an established public policy." *Id.* Under the essence test, the arbitrator's award will be upheld if: "(1) the issue as properly defined is within the terms of the collective bargaining agreement; and (2) the arbitrator's interpretation can rationally be derived from the collective bargaining agreement." *Dep't of Corr. v. Pa. State Corr. Officers Ass'n.*, 38 A.3d 975, 980 (Pa. Cmwlth. 2011). Further, "[a]n appellate court may not disregard an arbitrator's findings of fact . . . if the arbitrator is even arguably construing or applying the contract and acting within the scope of his or her authority." *City of Pittsburgh v. Fraternal Order of Police Fort Pitt Lodge No. 1*, 764 A.2d 101, 103 (Pa. Cmwlth. 2000), *appeal denied*, 781 A.2d 148 (Pa. 2001).

An arbitrator's award may, however, be vacated under a narrow exception to the essence test known as the public policy exception. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA*, 939 A.2d 855, 865 (Pa. 2007). Pursuant to the public policy exception, courts may not enforce arbitration awards that contravene public policy. *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334, 338 (Pa. Cmwlth. 2017) (*Neshaminy)* (en banc). In order to determine whether the public policy exception is applicable, courts must: (1) identify the nature of the conduct leading up to the discipline; (2) determine if the identified conduct implicates a well-defined, dominant public policy which is "ascertained by

6

reference to the laws and legal precedents and not from general considerations of supposed public interests[;]" and (3) determine if the arbitration award presents an unacceptable risk that the award will "undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty, given the particular circumstances at hand and the factual findings of the arbitrator." *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth.), *appeal denied*, 32 A.3d 1279 (Pa. 2011)).

Our courts have applied the public policy exception to invalidate arbitration awards that undermine the Commonwealth's public policy against sexual harassment and discrimination. *See Phila. Hous. Auth. v. Am. Fed'n of State, Cty. and Mun. Emps., Dist. Council 33, Local 934*, 52 A.3d 1117, 1123 (Pa. 2012) ("[T]he arbitrator's award forcing [the employer] to take [the employee] back with full back pay—without any sanction at all—violates a well-defined and dominant public policy against sexual harassment in the workplace . . . ."); *Neshaminy*, 171 A.3d at 343 (holding that arbitration award which reinstated with back pay minus 20-day suspension teacher who created hostile work environment for co-worker and engaged in lewd and suggestive statements to students, violated Commonwealth's public policy against sexual harassment); *Slippery Rock*, 71 A.3d at 365 ("The public policy against sexual discrimination, particularly of a student by an educator, is well-defined and rooted in the law."). Thus, the prohibition of sexual harassment constitutes a well-defined, dominant public policy recognized in this Commonwealth.

In *Slippery Rock*, this Court vacated an arbitration award that reinstated a college professor who engaged in sexually discriminatory behavior toward his female students on a trip abroad. Specifically, this Court determined that the

7

arbitration award violated the Commonwealth's clearly established public policy against sexual discrimination. On the trip abroad, the college professor asked his students how many sexual partners each of them had and made comments about a specific female student concerning his desire to receive oral sex from her. The employer-university terminated the college professor, but a union filed a grievance, resulting in an arbitration award reinstating the professor. This Court concluded that the arbitration award undermined the Commonwealth's well-defined public policy against sexual discrimination. In applying the public policy exception, this Court determined that the conduct that led to the college professor's termination—*i.e.*, making comments of a sexual nature to or about students—clearly implicates our public policy against sexual discrimination. Further, the arbitration award posed a risk of undermining our public policy and prevented the employer-university from implementing policies to punish the behavior at issue and protect other students from these acts.

In *Neshaminy*, this Court affirmed a trial court's order that vacated an arbitration award reinstating a school teacher who constantly made sexually explicit comments toward a co-teacher in the presence of students. On appeal, this Court determined that the arbitration award violated the Commonwealth's public policy against sexual harassment. In doing so, we discussed the ongoing nature of the teacher's comments and the fact that the comments were made in the presence of students, and we concluded that reinstating the teacher would most certainly implicate the aforementioned public policy. Further, the teacher's reinstatement would also present an unacceptable risk that our public policy would be undermined and the school district would be unable to enforce policies that punish such behavior, thereby weakening its ability to protect other students or teachers.

8

*Slippery Rock* and *Neshaminy*, both of which the University relies upon, demonstrate instances where this Court has applied the public policy exception to vacate arbitration awards on the basis that the conduct at issue—*i.e.*, unwelcome sexual comments in the context of a professional relationship—implicated the Commonwealth's well-defined, dominant public policy against sexual harassment and/or sexual discrimination. *Neshaminy*, 171 A.3d at 343; *Slippery Rock*, 71 A.3d at 366. The situation before the Court today is distinguishable, however, in that, here, the University seeks to vacate an award based on sexual conduct that occurred within the overall context of a consensual sexual relationship and asks this Court to find that the conduct was criminal.

To determine whether the public policy exception is applicable in the case now before the Court, we must first identify the nature of the conduct leading to the discipline. *Neshaminy*, 171 A.3d at 338. As discussed above, Grievant's termination resulted from his involvement in sexual relationships with Complainant and another student and his alleged performance of non-consensual sexual acts on Complainant while she slept. (R.R. at 673a.) We must also consider whether the "identified conduct implicates a well-defined, dominant public policy." *Neshaminy*, 171 A.3d at 338. As to this aspect of the analysis, the University's argument, boiled down to its essence, is that the arbitration award violates a dominant public policy against sexual harassment, because it reinstates to his position as a professor a criminal who committed the crime of indecent sexual assault. In advancing that argument, the University focuses solely on Grievant's alleged non-consensual sexual acts performed upon Complainant while she slept. Thus, we must turn to the facts of the case to determine whether Grievant's conduct implicates the public policy against sexual harassment.

As discussed above, Complainant's and Grievant's romantic relationship began the semester after Complainant completed Grievant's course. (R.R. at 147a.) Complainant alleged that, during the relationship, there were several times when she awoke to Grievant manipulating her genitals and that this act made her uncomfortable. (*Id.* at 169a-70a.) Complainant, however, continued to visit Grievant's home and engage in sexual intercourse on multiple occasions. (*Id.* at 170a.) Further, Complainant testified that she did not tell Grievant that these acts made her uncomfortable. (*Id*. at 171a-72a.) Grievant, on the other hand, denied that he committed these acts. (*Id*. at 771a.) The arbitrator, assuming, *arguendo*, that these acts occurred, determined that the circumstances surrounding the situation revealed that Grievant performed the acts in the context of a consensual sexual relationship and not as an act of sexual harassment. (*Id.* at 1793a.)

The University appears to argue that, despite the arbitrator's characterization of the context of Grievant's acts, the arbitration award requires the University to reinstate a criminal, given the nature of Grievant's alleged conduct. The obvious problem with the University's contention here is that there is no record that Grievant was ever charged with, prosecuted for, or convicted of indecent sexual assault stemming from the alleged acts. Rather, we are only dealing with an arbitrator's finding that if the alleged acts occurred, they occurred within the context of a consensual sexual relationship, which is permitted by the University's policies. An arbitration award, and particularly an appeal from an arbitration award under the deferential essence test, is not the proper venue to litigate whether a grievant is guilty of a crime. It is beyond this Court's purview to determine Grievant's guilt or innocence under our criminal laws. The University's argument on this point, therefore, is unpersuasive.

10

Recognizing that we cannot accept the University's invitation to engage in our own criminal analysis of Grievant's conduct, the Court's inquiry must focus on the arbitrator's findings and conclusions. Here, the arbitrator considered the University's policy against sexual harassment and discrimination, specifically as it pertains to unconsented physical sexual acts and consensual interpersonal relationships. The arbitrator expressly found that Grievant and Complainant engaged in a consensual sexual relationship and that Grievant's conduct did not violate any of the University's policies against sexual harassment and discrimination. (R.R. at 1792a-95a.) Thus, Grievant's conduct, as characterized by the arbitrator, does not implicate the public policy against sexual harassment. As a result, the arbitration award does not pose an unacceptable risk of undermining the public policy and does not prevent the University from upholding its obligation to protect the public. Accordingly, the public policy exception does not apply to invalidate the arbitration award.

Although we reach this conclusion today, we are in no way ignoring Grievant's appalling lack of judgment, especially as one who once held a position of trust for Complainant. As the arbitrator aptly stated in her opinion:

> This conclusion is not to be construed as condoning [Grievant's] conduct. The inherent exploitative nature of relationships with students . . . calls for greater insight and more restraint. That he avoided termination here does not mean that he was prudent, kind[,] or wise. Not only must he adhere to the letter of the policy, he should also strive to follow the spirit of the policy and acknowledge that he must hold himself to a higher standard.

(R.R. at 1796a.)

11

## IV. CONCLUSION

Based on the above discussion, we affirm the arbitration award.

_____
P. KEVIN BROBSON, Judge

Judge Fizzano Cannon did not participate in the decision of this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania State System of Higher : 
Education, Bloomsburg University : 
of Pennsylvania, : 
               Petitioner : 
                : 
         v. : No. 914 C.D. 2018
                : 
Association of Pennsylvania State : 
College and University Faculties, : 
            Respondent : 

## **O R D E R**

AND NOW, this 16ᵗʰ day of May, 2019, the arbitration award entered on June 7, 2018, in the above captioned matter is hereby AFFIRMED.

                                                 

                                      P. KEVIN BROBSON, Judge